[Cite as *In re J.R.*, 2018-Ohio-1474.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| In the Matter of: | : | |
| J.R., | : | No. 17AP-698 |
| | | (C.P.C. No. 13JU-14889) |
| (M.B., | : | |
| | | (REGULAR CALENDAR) |
| Appellant). | : | |

D E C I S I O N

Rendered on April 17, 2018

**On brief:** *Yeura R. Venters*, Public Defender, and *Robert D. Essex*, for appellant.

**On brief:** *Robert J. McClaren*, for appellee Franklin County Children Services.

APPEAL from the Franklin County Court of Common Pleas,
Division of Domestic Relations, Juvenile Branch

SADLER, J.

{¶ 1} Appellant, M.B., appeals from the judgment entry of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, granting the motion for permanent custody of J.R.[1] filed by appellee, Franklin County Children Services ("FCCS"). For the following reasons, we affirm the decision of the juvenile court.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 2} This case concerns legal permanent custody of J.R., a minor child born in July 2013 to appellant, M.B. (mother), and G.R. (father). On August 6, 2013, FCCS filed an

---

[1] J.R. was referred to as "J.B." in early court records; the name was corrected by court order on September 9, 2015.

emergency care order for J.R.; the record indicates that J.R. was placed in a certified foster home on August 7, 2013.

{¶ 3}    On October 30, 2013, FCCS refiled a complaint alleging J.R. to be an abused, neglected, and/or dependent child pursuant to R.C. 2151.031(C) and (D), 2151.03(A)(2), and 2151.04(C), and requesting an order of temporary custody based on J.R. testing positive for cocaine and marijuana at birth and appellant's positive drug screens and admission to relapsing.  The following day, October 31, 2013, a magistrate of the juvenile court granted FCCS's motion for temporary custody pending further hearing and ordered parental visits supervised by FCCS or its designee.

{¶ 4}    An adjudication hearing on FCCS's complaint was held on December 20, 2013, with appearances by appellant and her attorney, G.R. and his attorney, an assistant prosecuting attorney, FCCS's representative, and the guardian ad litem ("GAL") appointed for J.R.  The parties proceeded uncontested on the second cause of action of abuse under R.C. 2151.031(D), and the remaining causes of action were dismissed.  The magistrate filed a decision in the matter finding J.R. to be an abused child as defined in R.C. 2151.03(D), granting temporary custody to FCCS pursuant to R.C. 2151.353(A)(2) until further order of the court, approving and adopting a case plan submitted December 23, 2013, and setting the matter for annual review.  A judge approved and adopted the magistrate's decision on December 30, 2013.

{¶ 5}    On June 20, 2014, FCCS filed a first extension of temporary order noting appellant and G.R. made progress on case plan objectives and needed additional time to complete these objectives.  The juvenile court granted the motion on September 18, 2014.  On January 23, 2015, FCCS moved to terminate temporary custody due to the parents having completed their case plan objectives.  On February 9, 2015, the juvenile court permitted J.R. to be placed on leave with appellant for several weeks.

{¶ 6}    The annual review hearing was held March 11, 2015.  FCCS amended its request to terminate temporary custody to a request for a second extension of temporary custody based on appellant testing positive for cocaine, marijuana, and alcohol on three drug screens during the time J.R. was placed on leave with her.  The juvenile court dismissed FCCS's motion to terminate custody, maintained and extended the temporary

custody order for an additional period of up to six months, and adopted an amended case plan.

{¶ 7} On August 7, 2015, FCCS filed a motion for permanent custody for J.R., pursuant to R.C. 2151.413 and 2151.414, for purposes of securing a legally secure permanent placement for J.R. FCCS alleged in its motion that J.R. had been in its custody for 24 months, and appellant and G.R. have failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the home, namely, appellant's chemical dependency and the parents' lack of commitment toward J.R. by failing to complete their case plan objectives. G.R. filed a motion for permanent custody of J.R. on October 19, 2016.

{¶ 8} After several continuances, the termination hearing and hearing on G.R.'s motion for legal custody was set for trial on April 10, 2017. Both parents were present and represented by legal counsel during the hearing. At the outset of the hearing, both parents made an oral motion for a continuance to allow the parties more time to complete the employment and housing objectives of the case plan based on their recently obtained employment. FCCS objected, noting the permanent custody motion had been pending for one and one-half years, and the housing issue was related to the substance abuse issues which had not been addressed. The juvenile court denied the motion for continuance.

{¶ 9} FCCS first called appellant to testify as if on cross-examination. After initially being unable to remember where she lived in 2016, appellant testified she had her name on a lease of an apartment beginning in 2014 until she was evicted in October 2016 because she was unable to get assistance with her rent. Appellant moved in with her brother, then, on December 1, 2016, appellant began living in an extended stay hotel that she leased on a month-to-month basis for $1,600. Another person who she described as her best friend lived with her and was on the lease agreement as well.

{¶ 10} At the time of the hearing, appellant worked at a hotel six days a week to earn $400 per week after taxes. She had held the hotel job for two months preceding the hearing. Prior to the hotel job, appellant worked for a fast food restaurant for ten months and several years for a temporary agency. The longest appellant had held a job was eight years, which occurred prior to appellant moving to Columbus to attend college in 2004.

{¶ 11} Appellant testified she is not married and has one child, J.R. Appellant understood J.R. was initially placed in foster care because of her drug problem, her lack of stable housing, and the marijuana and cocaine that was in his system when he was born. Appellant understood her case plan for reunification with J.R. to include getting an alcohol and drug assessment, taking classes, and getting drug screens. Regarding the time when J.R. was placed on leave with her in 2015, appellant could not remember how long J.R. had lived with her but thought he had stayed with her from three to six months. In reality, J.R. had only actually lived with her for three weeks. Appellant testified, prior to J.R. staying with her in 2015, she got an assessment and took "A.O.D." classes two times per week for twenty weeks. (Apr. 10, 2017 Tr. at 28.) After J.R. stayed with her, appellant was assessed again but did not take any further classes.

{¶ 12} When asked whether she thinks she has a substance abuse problem, appellant responded "[n]o, I don't * * * '[c]ause (sic) I can quit when I want to." (Apr. 10, 2017 Tr. at 30.) When then asked why she had not quit using substances for the three and one-half years that FCCS needed her to do so to reunify with J.R., appellant responded she was homeless, trying to get stable, and "going through stuff, so shit happens. You get it together when you get it together." (Apr. 10, 2017 Tr. at 31.) According to appellant, she has had her life together for the past four months. Appellant likes a beer and marijuana "every now and then" but is "not touching cocaine." (Apr. 10, 2017 Tr. at 29.) Appellant testified the last time she smoked marijuana was three months prior to the hearing, the last time she used cocaine was approximately one year prior to the hearing, and she had a beer the day prior to the hearing. Appellant testified that "[i]n the beginning" she regularly submitted to urine screens required by the case plan, but she did not know how many she had completed and could not remember telling her caseworker that she would not be submitting to anymore screens. (Apr. 10, 2017 Tr. at 34.) According to appellant, she did everything FCCS wanted her to do except complete the drug screens.

{¶ 13} FCCS then called G.R. as if on cross-examination. G.R. testified he had been married from 1994 to 2009 and subsequently came to Columbus after his divorce. G.R. had lived in a Columbus apartment with appellant from 2014 to 2016 before moving to Youngstown to live in his ex-wife's house for about six months in 2016. From November 2016 to the time of the hearing, G.R. lived in a homeless shelter. G.R. testified he was

employed through a temporary service agency but did not know how much money he made a month. In addition to J.R., G.R. has two daughters and one son.

{¶ 14} Regarding the circumstances of why J.R. was placed in foster care immediately from the hospital, G.R. believed a caseworker lied that appellant abandoned him at the hospital. He was aware, but not concerned, that J.R. was born with marijuana and cocaine in his system since he had another daughter born with crack cocaine in her system and had no resulting problems. G.R. did not know if appellant had a substance abuse problem when they were together. G.R. testified he tested positive for one urine screen when someone put cocaine in one of his Jello shots and admitted to recently smoking marijuana to relieve stress and migraines; G.R. does not believe he has a substance abuse problem. G.R. testified to remembering telling his caseworker that he would not be doing any more urine screens. According to G.R., he completed his case plan objectives.

{¶ 15} The GAL testified that he was appointed in February 2015 around the time J.R. was placed on leave with appellant for a few weeks. The GAL had visited J.R. once in June 2015 and could not recall if he had special needs. The GAL visited appellant and G.R. when they lived together, met with G.R. when he lived in Youngstown, and met with appellant at the extended stay hotel. According to the GAL, during the June 2015 visit, appellant indicated to him she would be using cocaine because it was her birthday. In the opinion of the GAL, without consistent calling and screening, his concerns about appellant's substance abuse have not been reduced or eliminated. Regarding appellant's current housing, the GAL described the extended stay hotel as a one-bedroom layout occupied by both appellant and her friend, who is in a wheelchair; he did not know that the space would be adequate to accommodate J.R. given the layout of the room and believed the space to be inappropriate to raise a child. He noted that no plan for child care was given to him. The GAL could not recommend J.R. be reunified with appellant as long as she lived in the extended stay hotel and would not recommend J.R. be placed in a homeless shelter with his father.

{¶ 16} The GAL testified he had not observed appellant interacting with J.R.; he had observed J.R. in his foster home and observed J.R. was very comfortable with and bonded to his foster mother. According to the GAL, J.R., due to his age, is unable to understand what permanent custody means and is not able to express his wishes directly on the matter

of his custody. Considering everything he knew at the point of the hearing, the GAL recommended the court grant FCCS's motion.

{¶ 17} On cross-examination, the GAL reiterated he did not observe J.R. at the agency during his visits with appellant and G.R. and did not have any idea regarding the relationship between J.R. and appellant and G.R. The GAL additionally was not aware of whether J.R.'s current foster parents intended to adopt him.

{¶ 18} Ivy Pinkins, caseworker for FCCS, testified to being assigned to J.R.'s case in January 2017. According to Pinkins, in February 2015, appellant had made significant progress to the point the previous service team allowed J.R. to be placed on leave with appellant for approximately three weeks. However, appellant admitted, and a drug screen confirmed, she relapsed and used drugs during the time J.R. was placed on leave with her.

{¶ 19} According to Pinkins, appellant had not completed the amended case plan. Outstanding case plan objectives included urine screenings, an alcohol and drug assessment, housing, stable income, and parenting classes. Regarding urine screenings, Pinkins testified that out of the 347 urine screens appellant has been asked to complete, appellant completed only 44 screens. Pinkins testified she had spoken to appellant about barriers to completing the screens and whether or not she needed help. Appellant indicated transportation was an issue until her roommate started taking her to and from the screenings, and Pinkins stated appellant had been provided bus passes by FCCS in the past. Appellant additionally indicated her work schedule was a barrier to completing screenings, so Pinkins asked for her schedule of days off work and would arrange "walk-in" rather than "calling in" screenings. (Apr. 10, 2017 Tr. at 85.) Of the three walk-in screenings arranged by Pinkins, appellant completed one screen.

{¶ 20} Pinkins likewise testified appellant had not completed the substance abuse related objectives of the case plan, and, since Pinkins came on the case, appellant had no activity to address this issue. Appellant reported to Pinkins that she completed a mental health assessment, which is a different assessment than called for by the case plan. Pinkins had not been sent any documents confirming the mental health assessment, which is part of the protocol.

{¶ 21} Regarding stable housing, Pinkins testified appellant had been linked to two community service workers ("CSW") to assist with housing. The first CSW was unable to

assist appellant in moving appellant and G.R. when they lived together in the apartment because, at the time, they lost their employment, which is a prerequisite for securing housing. The second CSW reported to Pinkins that attempts to reach appellant on the telephone had failed. Pinkins testified she could not recommend appellant be reunited with J.R. in the extended stay hotel due to the small size and space of the living quarters and concerns regarding childcare since appellant "ha[d] yet to have a negative drug screen" while noting that "it's only assumed that she still uses at this point." (Apr. 10, 2017 Tr. at 91.)

{¶ 22} Pinkins described appellant's income as "sporadic" and testified to still having concerns about the nature of appellant's employment through a temporary agency with periods of time with no employment. (Apr. 10, 2017 Tr. at 83.) Pinkins reported that services for parenting education through the Ohio Guidestone Parent Mentor Program ("Guidestone") were discontinued for appellant due to a lack of progress. After the February 2015 leave, Pinkins testified appellant consistently visited J.R. on a weekly basis at the agency offices. She had not observed appellant or G.R. interact with J.R. but believed both appellant and G.R. felt bonded to him and interacted with him appropriately.

{¶ 23} Overall, Pinkins could not recommend reunification of J.R. with appellant or G.R., believed J.R. was in need of permanent placement, and recommended FCCS be granted permanent custody for the purpose of adoption. According to Pinkins, J.R. does not have any special needs or medical issues at this time. Pinkins relayed that the foster parents stated they do not wish to share their answer of whether they would adopt J.R.; in Pinkin's opinion, if the foster parents did not adopt him, another adoptive home could "[a]bsolutely" by recruited for him. (Apr. 10, 2017 Tr. at 102.) Pinkins confirmed no known relatives of appellant or G.R. had been identified who expressed interest in assuming custody of J.R.

{¶ 24} On cross-examination, Pinkins testified she had not personally visited appellant's extended stay hotel but had been in other such rooms before, and there is no legal prohibition regarding children living at extended stay hotels. Pinkins likewise agreed, although she had concerns regarding appellant's employment at a temporary agency, that would not be a reason for the agency to remove a child from a home. Pinkins testified she would not be surprised if a Guidestone parenting report listed appellant as having a seven

out of ten in goal compliance and nine out of ten in relationship building since the visits were going well.

{¶ 25} At that point, the termination hearing was continued/stayed to address an issue raised regarding appellant and G.R.'s alleged Cherokee heritage.[2]  The hearing resumed on August 14, 2017, and Pinkins continued her testimony on cross-examination. Regarding the bond between J.R. and appellant and G.R., Pinkins elaborated appellant and G.R. visited J.R. weekly, checked in with the foster parents occasionally to see how his progress is going, and hug when they see each other; she agreed their interactions are generally loving and supportive.  Regarding the mental health assessment, Pinkins testified that as of the continued hearing date, she had not received results of the assessment and was told by appellant she refused to sign a release to do so.

{¶ 26} Appellant then testified on direct, providing a post office box as her current address.  According to appellant, during her visits with J.R., he "lights up, runs, hugs, kisses [her]," and they have fun together; she calls him every day at his foster home, and J.R. sends her pictures and videos all the time from the foster mom's phone.  (Aug. 14, 2017 Tr. at 26.) Regarding her employment status, appellant testified the longest time she had gone without having any sort of job was three or four months, and she just started back to work due to breaking her hand in June, and the manager offered her a full-time job working in laundry and housekeeping for the hotel.  Appellant testified she signed a lease and paid a $950 deposit on a house in Whitehall and would receive the keys on August 28th, after she pays an additional $950 for the first month's rent.  Appellant testified she is prepared to move in to the house by the end of August.

{¶ 27} According to appellant, she "redid" the alcohol and drug assessment and signed release forms to allow record of her assessments to be given to the caseworker. (Aug. 14, 2017 Tr. at 29.)  Regarding the drug screens, appellant testified that "at the time, they weren't important," and obtaining housing and work were her first and second

---

[2] When asked about appellant's reported Cherokee heritage, Pinkins testified she had not done anything to comply with relevant federal laws.  As a result, the termination hearing was stayed/continued in order for FCCS to complete notices required by 25 U.S.C. 1912 related to both parties' report of Cherokee heritage.  The required notices were served on the Department of Interior Bureau of Indian Affairs, the Bureau of Indian Affairs—Eastern Regional Office, the Cherokee Nation, the Eastern Band of Cherokee Indians, and the United Keetoowah Band of Cherokee Indian in Oklahoma.  None of these bodies reported J.R. as an "Indian child" under the federal statute.  25 U.S.C. 1903.

priorities. (Aug. 14, 2017 Tr. at 33.) She testified she had been a "weekend user" of cocaine and had not used cocaine in over one year or "probably going on two." (Aug. 14, 2017 Tr. at 33.) Appellant testified J.R. was a premature baby, born at 32 weeks, and to her knowledge, J.R. did not have withdrawal symptoms in the hospital; she confirmed J.R. was in the hospital for nearly one month after birth, which appellant believed to be attributed to his prematurity. While J.R. was in the hospital, appellant visited him three times a day, every day, except for when she was sick and not permitted in the neonatal intensive care unit.

{¶ 28} On cross-examination, appellant testified she did not have any documentation with her in court regarding the lease or deposit she alleges she paid but said if the court could take a recess, she could get documentation of a $950 money order from her brother's car. She did not bring the documentation because she woke up late and forgot her "other folder with all [her] stuff for [her] apartment." (Aug. 14, 2017 Tr. at 35.) Appellant testified she had not completed any screens since a March 2017 visit from the GAL due to her work schedule extending beyond the screening facility hours.

{¶ 29} G.R. testified he was currently staying with friends but hoped to have a place to stay in September. He was currently employed though a temporary staffing agency as a machine loader, and if he got hired full-time, he would make $15 per hour. G.R. also testified he had four other grown children and had a relationship with all of them, and he and appellant completed a parenting program through Guidestone. The parties rested, and neither appellant nor G.R. offered additional exhibits into evidence. A brief recess was held and the parties made closing arguments, and the GAL testified that he would not change his initial recommendation to grant FCCS's motion for permanent custody.

{¶ 30} On September 1, 2017, the juvenile court filed a judgment entry granting FCCS's motion for permanent custody and denying G.R.'s motion for legal custody of J.R. The juvenile court found, pursuant to R.C. 2151.414(B)(1)(d), J.R. had been in the continuous custody of FCCS for a period of over 24 months. As an alternative basis, the juvenile court found, under R.C. 2151.414(B)(1)(a), J.R. could not be placed with any parent within a reasonable time and should not be placed with any parent because, under R.C. 2151.414(E)(1), (4), and (16), the parents have failed continuously and repeatedly to substantially remedy the conditions causing J.R. to be placed outside the child's home,

demonstrated a lack of commitment toward J.R. including "showing an unwillingness to provide an adequate (drug free) permanent home," and are unwilling to provide basic necessities for J.R., "*to wit, a drug free home.*" (Emphasis sic.) (Sept. 1, 2017 Juvenile Ct. Jgmt. at 12.) Particular to the case plan, the juvenile court found appellant failed to complete essential elements of the case plan objectives and made little, if any, progress toward reunification. Specifically, the juvenile court found appellant failed to complete an alcohol and drug assessment and follow recommendations, complete random urine screens, and complete a parenting program. The juvenile court did not find appellant's testimony that she has been clean or in remission to be credible. The juvenile court did not indicate whether appellant complied with or failed the case plan objectives of maintaining a legal source of income, securing safe and stable housing, or attending weekly visitations but noted appellant testified she had a job at a hotel, had no current address but intended to move to a house she leased by the end of the month, was reasonably consistent in weekly visitations, and, in what is "[l]ikely an exaggeration," talks with J.R. every day. (Sept. 1, 2017 Juvenile Ct. Jgmt. at 11.)

{¶ 31} Regarding the best interest of J.R., the juvenile court noted that J.R. had a bond with both his foster parents and with appellant and G.R., was too young to express his wishes in the matter, and, after a custodial history of over four years, was in need of permanency. According to the juvenile court, such permanency could not be achieved without an order of permanent custody to FCCS. On review and weighing of all relevant statutory factors in R.C. 2151.414(D)(1), the juvenile court found by clear and convincing evidence that granting FCCS's motion is in J.R.'s best interest. The juvenile court also concluded R.C. 2151.414(D)(2) required a finding that terminating parental rights was in the best interest of the child since all four statutory elements were proved by clear and convincing evidence. Therefore, the juvenile court ordered J.R. committed to the permanent custody of FCCS for the purpose of adoption.

{¶ 32} Appellant filed a timely appeal to this court.

## II. ASSIGNMENT OF ERROR

{¶ 33} Appellant presents one assignment of error:

> The trial court committed reversible error by terminating Appellant's parental rights.

### III.  STANDARD OF REVIEW

{¶ 34} "A trial court's determination in a PCC case will not be reversed on appeal unless it is against the manifest weight of the evidence." *In re K.M.*, 10th Dist. No. 15AP-64, 2015-Ohio-4682, ¶ 13, citing *In re Andy-Jones*, 10th Dist. No. 03AP-1167, 2004-Ohio-3312, ¶ 28, *discretionary appeal not allowed*, 103 Ohio St.3d 1429, 2004-Ohio-4524. " 'An appellate court will not overturn a permanent custody order when it is supported by competent, credible evidence.' " *In re M.W.*, 10th Dist. No. 11AP-524, 2011-Ohio-6392, ¶ 20, quoting *In re Siders*, 10th Dist. No. 96APF04-413 (Oct. 29, 1996), citing *In re Brofford*, 83 Ohio App.3d 869, 876-77 (10th Dist.1992). *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279 (1978), paragraph one of the syllabus.

{¶ 35} In reviewing a judgment granting permanent custody to FCCS under the manifest weight standard, " 'an appellate court "must make every reasonable presumption in favor of the judgment and the trial court's findings of facts." ' " *K.M.* at ¶ 13, quoting *In re J.T.*, 10th Dist. No. 11AP-1056, 2012-Ohio-2818, ¶ 8, quoting *In re P.G.*, 10th Dist. No. 11AP-574, 2012-Ohio-469, ¶ 37.  " ' "[I]f the evidence is susceptible of more than one construction, we must give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the [juvenile] court's verdict and judgment." ' " *K.M.* at ¶ 13, quoting *In re Brooks*, 10th Dist. No. 04AP-164, 2004-Ohio-3887, ¶ 59, quoting *Karches v. Cincinnati*, 38 Ohio St.3d 12, 19 (1988).

### IV.  DISCUSSION

{¶ 36} In her sole assignment of error, appellant contends the juvenile court erred when it terminated her parental rights.  For the following reasons, we disagree.

{¶ 37} As set forth in *K.M.* at ¶ 15:

> Parents have a constitutionally-protected fundamental interest in the care, custody, and management of their children. *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000).  The Supreme Court of Ohio has recognized the essential and basic rights of a parent to raise his or her child. *In re Murray*, 52 Ohio St.3d 155, 157, 556 N.E.2d 1169 (1990); *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, ¶ 28, 862 N.E.2d 816.  These rights, however, are not absolute, and a parent's natural rights are always subject to the ultimate welfare of the

child.  *In re Cunningham*, 59 Ohio St.2d 100, 106, 391 N.E.2d 1034 (1979).

{¶ 38}  R.C. 2151.414 governs the procedure for granting permanent custody of a child to a public agency such as FCCS.  *J.T.* at ¶ 9.  R.C. 2151.414 does not require a juvenile court to find a parent unfit before it may terminate that parent's parental rights.  *In re B.L.*, 10th Dist. No. 04AP-1108, 2005-Ohio-1151, ¶ 22.  A decision to award permanent custody requires the juvenile court to take a two-step approach.  *In re K.L.*, 10th Dist. No. 13AP-218, 2013-Ohio-3499, ¶ 18.  First, under R.C. 2151.414(B)(1), a juvenile court may grant permanent custody if after a custody trial the court determines, by clear and convincing evidence, that "(1) any of the circumstances in R.C. 2151.414(B)(1)(a) through (d) exist, and (2) such relief is in the best interest of the child.  Clear and convincing evidence means the measure of proof that produces ' "a firm belief or conviction as to the facts sought to be established." ' "  *K.M.* at ¶ 14, quoting *In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, ¶ 42, quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶ 39}  Regarding step one, FCCS moved for permanent custody under two grounds: R.C. 2151.414(B)(1)(a) and (d).  The juvenile court made alternative findings under each section and concluded both R.C. 2151.414(B)(1)(a) and (d) were met.  Appellant does not argue the juvenile court erred in this respect.  Moreover, the undisputed evidence presented at the custody trial clearly establishes, pursuant to R.C. 2151.414(B)(1)(d), J.R. had been in the temporary custody of FCCS for 12 or more months of a consecutive 22-month period.  Therefore, because the evidence supports the juvenile court's finding the circumstances under R.C. 2151.414(B)(1)(d) exist, permanent custody shall be granted to FCCS if such relief is in the child's best interest.  R.C. 2151.414(B)(1).

{¶ 40}  In determining the best interest of J.R., R.C. 2151.414(D)(1) states the juvenile court must consider all relevant factors, including, but not limited to:

> (a)  The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b)  The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

{¶ 41} R.C. 2151.414(D)(2) sets forth a specific set of circumstances where granting permanent custody to FCCS is per se in the best interest of the child. Specifically, "permanent custody is in the best interest of the child, and the court shall commit the child to the permanent custody of a public children services agency or private child placing agency" if all the following apply:

(a) The court determines by clear and convincing evidence that one or more of the factors in division (E) of this section exist and the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent.

(b) The child has been in an agency's custody for two years or longer, and no longer qualifies for temporary custody pursuant to division (D) of section 2151.415 of the Revised Code.

(c) The child does not meet the requirements for a planned permanent living arrangement pursuant to division (A)(5) of section 2151.353 of the Revised Code.

(d) Prior to the dispositional hearing, no relative or other interested person has filed, or has been identified in, a motion for legal custody of the child.

R.C. 2151.414(D)(2).

{¶ 42} Under R.C. 2151.414(D), a parent's compliance with a case plan may be relevant to determining whether it is in a child's best interest to grant or to deny permanent custody to the agency. *Brooks* at ¶ 62-63. However, "R.C. 2151.414(D) does not require

courts to deny a children services agency's motion for permanent custody solely by virtue of a parent's substantial compliance with the case plan." *Id.* at ¶ 62.

{¶ 43} Here, in concluding the granting of permanent custody of J.R. to FCCS was in the best interest of the child, the juvenile court first considered and weighed the factors set forth in R.C. 2151.414(D)(1)(a) through (e). For purposes of R.C. 2151.414(D)(1)(a), there is no dispute that J.R. has a bond with appellant. Appellant testified she visits J.R. weekly and calls him daily, and they have a strong bond. The caseworker confirmed appellant's consistent visitations with J.R. and generally loving and supportive interactions with him. The GAL testified J.R. has also formed a bond with his foster parents. It is unclear whether the foster parents are willing to adopt J.R. With regard to the wishes of J.R., under R.C. 2151.414(D)(1)(b), the GAL testified J.R. is too young to express an opinion on the matter.

{¶ 44} R.C. 2151.414(D)(1)(c) pertains to J.R.'s custodial history. In this case, J.R. had been in custody of FCCS for the entire two-year period preceding the motion for permanent custody. Within this time frame, J.R. only lived with appellant for approximately three weeks while on leave with her in February 2015; appellant abused drugs and alcohol while J.R. was with her during this time. This factor favors granting permanent custody to FCCS. *K.M.* at ¶ 27 (finding R.C. 2151.414(D)(1)(c) satisfied where the children had been in the temporary custody of FCCS for 20 out the consecutive 22-month period preceding the motion for permanent custody).

{¶ 45} R.C. 2151.414(D)(1)(d) concerns the child's need for legally secure permanent placement and whether such a secure permanent placement can be achieved without a grant of permanent custody to the agency. As framed in the facts, J.R. has experienced a long custodial history with FCCS nearly since birth; appellant does not dispute J.R. is in need of a secure permanent placement. Rather, appellant essentially argues a secure permanent placement can be achieved without a grant of permanent custody to the agency because she substantially complied with her case plan and is not unfit to care for him, and it is in the best interest of J.R. to be with her. On this record, we disagree with appellant.

{¶ 46} Appellant has demonstrated the ability to achieve a relatively consistent income. However, the impetus for removing J.R. from his parents' custody and the persistent problem in this case has been appellant's drug use. It is undisputed that out of

the 347 urine screens required by her case plan, appellant completed only 44 screens, and none of those were clean. Appellant testified she did not complete screens due to time barriers related to her work schedule, she does not have a substance abuse problem because she can stop anytime she wants to, and she has completed two alcohol and drug assessments and twenty weeks of substance abuse classes. However, the progress cited by appellant largely occurred prior to February 2015, when J.R. was placed on leave with her. On the brink of reuniting with J.R., appellant would not or could not refrain from using drugs during the only time period J.R. was permitted to live with her. While appellant testified she had not used cocaine in the past year or two and had not used marijuana in the past several months, the juvenile court found appellant's testimony that she does not use drugs lacked credibility. Judging the credibility of witnesses is an inherent part of a juvenile court's responsibility in permanent custody cases. *In re Jones*, 10th Dist. No. 01AP-616 (Dec. 27, 2001). The record does not support a finding that appellant has resolved her substance abuse issues since her relapse in 2015 but, rather, demonstrates appellant's refusal to seriously commit herself to achieving sobriety.

{¶ 47} Furthermore, although appellant appears to be able to maintain relatively consistent employment, such employment has not yielded a secure home for J.R. to live. Despite literally years to find suitable housing for J.R., at the time of the August 2017 hearing, appellant's housing status remained in flux. It is unclear whether appellant remained at the extended stay hotel. Regardless, both the caseworker and the GAL testified they could not recommend placement of J.R. at the extended stay hotel due to the size and space being unsuitable for J.R. Appellant contended she had secured future housing and, in her brief, alludes to not being permitted to take a recess to get documentation to verify her receipt for a deposit on a house. Even if appellant signed and put a deposit on a house as she contended at the August 2017 hearing, her alleged pending move was dependent on her ability to make a subsequent payment of her first month's rent. This hypothetical move to a house, considering appellant's history of being unable to retain stable housing during J.R.'s lifetime for an extended period of time, did not establish a secure place for J.R. to live.

{¶ 48} Lastly, no other relative either willing or able to assume custody of J.R. was identified in this case. Because J.R. has a strong need for a legally secure permanent

placement, and because such a secure permanent placement cannot be achieved without a grant of permanent custody to the agency, R.C. 2151.414(D)(1)(d) is met.

{¶ 49} As noted by the juvenile court, FCCS did not offer evidence under R.C. 2151.414(D)(1)(e), which discusses whether any of the factors in R.C. 2151.414(E)(7) through (11) apply.

{¶ 50} In addition to the factors expressly listed in R.C. 2151.414(D)(1), the juvenile court examined appellant's progress in completing her case plan. Appellant argues that contrary to the juvenile court's decision, appellant did "substantially comply" with the case plan, including completing two drug and alcohol assessments, attending twenty weeks of substance abuse classes two times per week, not using cocaine in over one year, being consistently employed, just signing a lease and paying a deposit on a house, and completing parenting classes. (Appellant's Brief at 18.) Even considering appellant's arguments about her case plan objectives, reviewing the record as a whole, the juvenile court's determination that appellant failed to complete the "essential components" of the case plan is supported by the record. (Sept. 1, 2017 Juvenile Ct. Judgment at 11.) Appellant admits the testimony showed that she completed 44 of 347 drug screens and all 44 completed were "dirty." (Appellant's Brief at 18.) Moreover, as discussed previously, appellant's progress largely occurred prior to her relapse in February 2015; since then, appellant has shown little progress in addressing her case plan objectives, was not credible in testifying to her sobriety, and did not offer more than a possible appropriate housing option, that may or may not be secured in the future, as a permanent home for J.R.

{¶ 51} Overall, we find the juvenile court's best interest finding under R.C. 2151.414(D)(1) to be supported by competent, credible evidence. The juvenile court additionally concluded a finding is required under R.C. 2151.414(D)(2) that termination of parental rights is in J.R.'s best interest. We agree with the juvenile court.

{¶ 52} Under R.C. 2151.414(D)(2)(a), clear and convincing evidence shows that R.C. 2151.414(E)(1), (4), and (16) are met and that J.R. cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent due to the parents' continuous and repeated failure to substantially remedy substance abuse issues and unwillingness to provide an adequate, drug free permanent home for J.R. Under R.C. 2151.414(D)(2)(b), J.R. has been in FCCS's custody for two years or longer and no longer

qualifies for temporary custody pursuant to R.C. 2151.415(D).[3]   Under R.C. 2151.414(D)(2)(c), J.R. does not meet the requirements for a planned permanent living arrangement, pursuant to R.C. 2151.353(A)(5), which concerns certain children who are 16 years of age or older.  Under R.C. 2151.414(D)(2)(d), prior to the dispositional hearing, no relative or other interested person had filed, or had been identified in, a motion for legal custody of J.R.  Therefore, R.C. 2151.414(D)(2)(a) through (d) apply, rendering permanent custody in the best interest of J.R.

{¶ 53} Considering all the above, we find competent and credible evidence supports the juvenile court's finding that it was in J.R.'s best interest to grant FCCS permanent custody.  As such, the juvenile court's judgment awarding FCCS permanent custody is not against the manifest weight of the evidence.

{¶ 54} Accordingly, appellant's assignment of error is overruled.

## V.  CONCLUSION

{¶ 55} Having overruled appellant's sole assignment of error, we affirm the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch.

*Judgment affirmed.*

BRUNNER and HORTON, JJ., concur.

_____

---

[3] R.C. 2151.415(D)(4) reads: "No court shall grant an agency more than two extensions of temporary custody pursuant to division (D) of this section and the court shall not order an existing temporary custody order to continue beyond two years after the date on which the complaint was filed or the child was first placed into shelter care, whichever date is earlier, regardless of whether any extensions have been previously ordered pursuant to division (D) of this section."  Appellant has not challenged the juvenile court's findings in this regard.