[Cite as *In re A.K.*, 2026-Ohio-1778.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| IN RE A.K., ET AL. | : | |
| Minor Children | : | No. 115840 |
| [Appeal by A.V., Mother] | : | |

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** May 14, 2026

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case Nos. AD-23-909971 and AD-23-909972

### *Appearances:*

Brian A. Smith Law Firm, LLC and Brian A. Smith, *for appellant*.

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Joseph C. Young, Assistant Prosecuting Attorney, *for appellee.*

EILEEN A. GALLAGHER, J.:

{¶ 1} Appellant-mother A.V. ("Mother") appeals from the juvenile court's judgment granting permanent custody of her minor children, A.K., and S.A., to appellee, Cuyahoga County Division of Children and Family Services ("CCDCFS" or "the agency"). Mother raises the following assignment of error for review:

The trial court's rulings in case numbers AD-23-909971 and AD-23-909972 granting appellee's motion to modify temporary custody to permanent custody, were against the manifest weight of the evidence.

{¶ 2} After careful review of the record and relevant case law, we affirm the juvenile court's judgment.

## I. Procedural and Factual History

{¶ 3} A.V. is the biological mother of both A.K. (d.o.b. 04/18/2020) and S.A. (d.o.b. 08/02/2023). D.K. is the alleged biological father of A.K.; however, paternity has not been established. Sh.A. is the biological father of S.A.[1]

{¶ 4} On August 30, 2023, CCDCFS filed a complaint for temporary custody of both children, alleging that S.A. was abused as defined in R.C. 2151.031, and that both children were neglected and dependent as defined in R.C. 2151.03 and 2151.04. The complaint relied on the following particulars:

1. Mother has a substance abuse problem that interferes with her ability to provide appropriate care for her children. Mother tested positive for fentanyl and cocaine during the second and third trimester of her pregnancy.

2. S.A. has been hospitalized and treated for withdrawal symptoms following his birth.

3. Mother lacks the decision making and parenting skills to provide appropriate care for the children.

4. Mother has an older child who is no longer in her custody due in part to Mother's substance abuse issues. See case no. AD-18-906953.

5. Mother has a criminal conviction for possession of drugs.

---

[1] The children's fathers are not parties to this appeal; therefore, our analysis will primarily focus on the circumstances relating to Mother.

6. Alleged father of A.K., [D.K.], has failed to establish paternity, support, visit, or communicate with the child on a consistent basis.

7. Alleged father of S.A., [Sh.A.], has yet to establish paternity.

8. Alleged father of S.A., [Sh.A.], is a registered sex offender and was convicted of unlawful sexual conduct with a minor, promoting prostitution and notice of change of address.

Following a hearing, the children were committed to the emergency temporary care of the agency on August 31, 2023.

{¶ 5} On November 13, 2023, a hearing on CCDCFS's complaint for temporary custody was held before a magistrate. At the conclusion of the hearing, the magistrate found the allegations of an amended complaint were proven by clear and convincing evidence. Accordingly, S.A. was adjudicated abused, neglected and dependent. A.K. was adjudicated neglected and dependent. Both children were placed in the temporary custody of the agency. On December 8, 2023, the trial court adopted the magistrate's decision. The trial court subsequently approved a case plan that was developed and implemented to promote the permanency plan of reunification.

{¶ 6} On August 20, 2024, CCDCFS filed a motion to modify temporary custody to permanent custody pursuant to R.C. 2151.413. The motion was supported by the affidavit of CCDCFS social worker, Deshawn Jones ("Jones"), who alleged, in pertinent part:

5. A case plan was filed with the Juvenile Court and approved which requires that mother engage in substance abuse treatment services;

6. Mother has failed to consistently engage in substance abuse treatment services. Her most recent screen in March of 2024 was

positive for fentanyl, cocaine, and marijuana. She has declined all subsequent requests to screen and does not have a documented sobriety date;

7. Mother has another child who was adjudicated abused due in part to Mother's substance abuse. That child is now in the legal custody of a relative. See Case No. AD-18-906958;

8. Mother is currently incarcerated in the Cuyahoga County jail due to a violation of probation related to her conviction of drug possession. *See* Cuyahoga County C.P. No. 23-CR-6796671 [sic].

{¶ 7} Following several continuances, the matter proceeded to a trial on September 25, 2025. On behalf of the agency, DeLayna Campbell ("Campbell"), testified that she is employed as a child protective specialist with CCDCFS and was the first extended service worker assigned to the children's case. Campbell outlined the procedural history of the case and explained the circumstances that caused the children to be removed from Mother's care, including Mother's history of drug abuse and past interactions with the agency.

{¶ 8} During the pendency of this case, a case plan for reunification was developed, and amended as appropriate, to assist Mother in addressing the agency's ongoing concerns. In pertinent part, the case plan required Mother to (1) successfully complete an inpatient drug treatment program, submit to scheduled and random urine screens as requested and sign a release of information as requested; and (2) provide the agency with a copy of her mental-health evaluation, sign a release of information as requested, engage in any recommended services and follow through with any recommended appointments or medications.

**{¶ 9}** Substance-abuse objectives were included in the case plan because Mother (1) "has a history of drug abuse" (2) "tested positive for cocaine and fentanyl in her third trimester" and (3) S.A. tested positive for methadone at the time of birth. (R. 111.) In addition, S.A. was born while Mother was incarcerated for a drug-related conviction. As a condition of her release from jail, Mother was ordered to successfully complete an inpatient program at the Hitchcock Center for Women (Tr. 21, Nov. 13, 2023.)

**{¶ 10}** Campbell testified that Mother completed substance-abuse services through Hitchcock in February 2024. However, Mother subsequently relapsed and tested positive for cocaine and fentanyl from a hair sample submitted in March 2024. (R. 148.) Mother was then referred to Signature Health where she was diagnosed with "opiate use disorder, severe" and "cocaine use disorder, severe." (Tr. 19, 69.) Following a substance-abuse assessment in February 2024, it was recommended that Mother complete an intensive outpatient treatment program through Signature Health. Specifically, it was recommended that Mother participate in a program that met three hours per day, three times per week, for a 12-week period. According to Campbell, Mother only attended one treatment session through Signature Health before disengaging from the provider. Megan Branstein ("Branstein"), a substance abuse counselor employed by Signature Health, confirmed that Mother did not consistently attend scheduled appointments, did not complete required drug screens and did not successfully complete the recommended outpatient program. Branstein stated that the provider's relationship

with Mother was minimal and consisted of "one group session" and "a few phone calls." (Tr. 68.)

{¶ 11} After Mother ended her services through Signature Health, she notified the agency that she intended to start services through OhioGuidestone. Campbell confirmed that Mother was able to enroll herself into an outpatient program at OhioGuidestone and began the services approximately two months before the permanent custody trial. However, when Campbell spoke with representatives from OhioGuidestone, she learned that Mother only attended one virtual treatment session. And, during that session, Mother did not turn on her camera and logged off approximately 20 minutes into the session. Thus, OhioGuidestone "did not consider that a completion of the session." (Tr. 21.) For this reason, Campbell testified that, as of the date of trial, there was no verifiable evidence to suggest Mother has completed the recommended outpatient services. Campbell further testified that Mother's last drug screen for the agency occurred in May 2024. Thereafter, Mother did not submit to any of the agency's requested drug screens between February 2025 and September 2025. Nor did Mother provide the agency with any records indicating that she completed a drug screen at an independent location.

{¶ 12} Mental-health objectives were included in the case plan because Mother "is diagnosed with anxiety, depression, post-traumatic stress disorder, and attention-deficit/hyperactivity disorder." (R. 111.) Mother was referred for mental-health services through Signature Health and completed an initial intake evaluation.

Mother's medical records indicate that she participated in mental-health sessions at Signature Health but attended only five of the 22 scheduled appointments. (CCDCFS exhibit No. 10.) Mother later notified the agency that she intended to continue her mental-health services through OhioGuidestone. While at OhioGuidestone, Mother was diagnosed with significant mental-health disorders that required continuing mental-health counseling and medication management. The records indicate, however, that Mother's engagement with OhioGuidestone was sparse. Specifically, Campbell testified that Mother's attendance at a therapeutic appointment on July 20, 2025, was OhioGuidestone's "first encounter with the client in about a year." (Tr. 28; CCDCFS exhibit No. 11.) Mother attended no other appointments prior to trial. (*Id.*) Given Mother's inconsistent participation in recommended services, Campbell stated that Mother had not complied with the mental-health objectives of her case plan.

{¶ 13} Stable and appropriate housing also remained a concern for the agency. Campbell testified that Mother claimed to have housing through the EDEN housing program. However, as of trial, Mother had not provided the agency with a copy of her lease or other documentation from EDEN. Campbell testified that she attempted to discuss Mother's housing situation with representatives of EDEN before trial but was unable to "verify [Mother]'s current housing" situation. (Tr. 29.) Under cross-examination, Campbell did concede that she previously visited Mother's residence and that it was a suitable home. Nevertheless, Campbell opined that, as of the date of trial, she could not confirm the terms of the lease agreement

or whether Mother was legally residing in the home. Campbell further stated that Mother is not currently employed and has not presented the agency with documentation to suggest otherwise.

{¶ 14} With respect to visitation, Campbell testified that Mother has exercised her right to visitation during the pendency of this case. Initially, Mother participated in supervised overnight visits with the children while she was residing at Hitchcock. Thereafter, the court permitted Mother to participate in unsupervised visits with the children over the agency's objection. However, these visits were terminated after Mother was incarcerated in late 2024. Upon her release in February 2025, Mother began weekly supervised visits with the children. Campbell testified that Mother's visits with the children were appropriate and that there is an observable, loving bond between Mother and the children.

{¶ 15} The last visit with the children, prior to trial, occurred on August 7, 2025. Campbell testified that the agency attempted to facilitate a visit on August 14, 2025. Mother, however, failed to respond. Mother notified the agency that she was unable to participate in the August 14, 2025 visit because her phone had been stolen. CCDCFS later learned, however, that Mother had been arrested and incarcerated on a new charge of receiving stolen property. (CCDCFS exhibit No. 7.)

{¶ 16} Regarding the children's biological fathers, Campbell testified that S.A.'s father, Sh.A., was incarcerated following a probation violation. The agency had ongoing concerns with Sh.A.'s ability to receive custody of the child due to his criminal history, including a prior case involving sexual crimes with minors. With

respect to A.K., Campbell testified that the alleged father, D.K., did not establish paternity or engage with the agency during the pendency of this matter. Campbell further testified that the agency attempted to identify suitable relatives for placement prior to trial. Their efforts, ultimately, proved unsuccessful.

{¶ 17} Finally, Campbell provided extensive testimony concerning the children's current placement. The children are currently placed in separate foster homes because their respective caregivers are unable to take both children. A.K. was originally placed with her maternal grandfather. She was subsequently moved to the residence of her maternal cousin at the request of the maternal grandfather. A.K. has "adjusted well" to her current placement and appears to be "well bonded" with her caregivers. (Tr. 37.) S.A. has been placed with a fictive kin since he came into the agency's custody. Campbell testified that S.A. is "very well bonded" and "emotionally attached" to his caregivers. (Tr. 38.) A.K. and S.A. are also bonded with each other and their respective caregivers "have the understanding and the willingness to continue visitation between the two of them outside of visitation, as well." (Tr. 39-40.)

{¶ 18} Based on the foregoing, Campbell opined that Mother had not remedied the conditions leading to the children's removal and, therefore, was unable to provide the children with a safe, stable and permanent home. Accordingly, Campbell believed that the children were still in need of a legally secure permanent placement.

{¶ 19} At the conclusion of trial, the court heard from the child's guardian ad litem (the "GAL"). Consistent with the recommendations of the agency's employees, the GAL recommended that permanent custody be granted in favor of CCDCFS. The GAL summarized her position as follows:

> Your Honor, I still continue to recommend permanent custody for these children. They are thriving in their current placements.
>
> Unfortunately, love isn't enough in this case. There's no doubt in my mind that mother loves her children and that her children love her.
>
> Unfortunately, my recommendation and opinion is they need a sober caregiver in order to consistently provide for their needs. And that just hasn't happened in time.
>
> I know mother has expressed repeatedly a desire to get sober, but we need action steps and we didn't get that in this case.

(Tr. 76-77.)

{¶ 20} On October 20, 2025, the juvenile court issued separate journal entries granting the agency's motion for permanent custody, thereby terminating Mother's parental rights. This timely appeal followed.

## II. Law and Analysis

### A. Manifest Weight of the Evidence

{¶ 21} In the sole assignments of error in the respective cases, Mother argues the juvenile court's judgment granting permanent custody to CCDCFS is against the manifest weight of the evidence. Mother contends that the evidence presented at trial demonstrated, contrary to the juvenile court's findings, that "the children could be placed with Mother within a reasonable time." Mother further suggests that the juvenile court's best interests determination failed to adequately consider material

facts, including (1) her stable housing in the City of Lakewood, (2) her uncontested bond with the children, (3) her history of appropriate visitation with the children, (4) her continued engagement in substance-abuse counseling and (5) Campbell's "lack of definite knowledge of Mother's case plan involvement and use of services."

{¶ 22} As always, we take our responsibility in reviewing cases involving the termination of parental rights and the award of permanent custody very seriously. A parent has a "'fundamental liberty interest' in the care, custody and management" of his or her child, *In re Murray*, 52 Ohio St.3d 155, 156 (1990), quoting *Santosky v. Kramer*, 455 U.S. 745, 753 (1982), and the right to raise one's own child is "'an essential and basic civil right.'" *In re N.B.*, 2015-Ohio-314, ¶ 67 (8th Dist.), quoting *In re Hayes*, 79 Ohio St.3d 46, 48 (1997). However, this right is not absolute. It is "'always subject to the ultimate welfare of the child, which is the polestar or controlling principle to be observed.'" *In re L.D.*, 2017-Ohio-1037, ¶ 29 (8th Dist.), quoting *In re Cunningham*, 59 Ohio St.2d 100, 106 (1979).

{¶ 23} Because the termination of parental rights is "'the family law equivalent of the death penalty in a criminal case,'" it is "an alternative [of] last resort." *In re J.B.*, 2013-Ohio-1704, ¶ 66 (8th Dist.), quoting *In re Hoffman*, 2002-Ohio-5368, ¶ 14; *In re Gill*, 2002-Ohio-3242, ¶ 21 (8th Dist.). It is, however, "sanctioned when necessary for the welfare of a child." *In re M.S.*, 2015-Ohio-1028, ¶ 7 (8th Dist.), citing *In re Wise*, 96 Ohio App.3d 619, 624 (9th Dist. 1994). All children have "'the right, if possible, to parenting from either natural or adoptive parents which provides support, care, discipline, protection and motivation.'" *In re*

*J.B.* at ¶ 66, quoting *In re Hitchcock*, 120 Ohio App.3d 88, 102 (8th Dist. 1996). Where parental rights are terminated, the goal is to create "a more stable life" for dependent children and to "facilitate adoption to foster permanency for children." *In re N.B.* at ¶ 67, citing *In re Howard*, 1986 Ohio App. LEXIS 7860, 5 (5th Dist. Aug. 1, 1986).

## 1. Standard of Review

{¶ 24} R.C. 2151.414 provides a two-prong analysis to be applied by a juvenile court in adjudicating a motion for permanent custody. *In re S.C.*, 2018-Ohio-2523, ¶ 20 (8th Dist.), citing R.C. 2151.414(B). This first prong of this statute authorizes the juvenile court to grant permanent custody of a child to the public agency if, after a hearing, the court determines, by clear and convincing evidence, that any of the following factors apply: (a) the child is not abandoned or orphaned but the child cannot, or should not, be placed with either parent within a reasonable time, (b) the child is abandoned, (c) the child is orphaned and there are no relatives of the child who are able to take permanent custody, (d) the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for 12 or more months of a consecutive 22-month period or (e) the child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected or dependent child on three separate occasions by any court in this state or another state. R.C. 2151.414(B)(1)(a)-(e).

{¶ 25} In accordance with the second prong of R.C. 2151.414, when any one of the above factors exists, the juvenile court must then analyze whether, by clear and convincing evidence, it is in the best interest of the child to grant permanent custody to the agency pursuant to R.C. 2151.414(D). "'Clear and convincing evidence is that measure or degree of proof which is more than a mere "preponderance of the evidence," but not to the extent of such certainty as is required "beyond a reasonable doubt" in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.'" *In re Z.C.,* 2023-Ohio-4703*, ¶ 7, quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶ 26} The Supreme Court of Ohio clarified the standard of review in permanent custody cases, explaining that

> [g]iven that R.C. 2151.414 requires that a juvenile court find by clear and convincing evidence that the statutory requirements are met . . . the sufficiency-of-the-evidence and/or manifest-weight-of-the-evidence standards of review are the proper appellate standards of review of a juvenile court's permanent-custody determination, as appropriate depending on the nature of the arguments that are presented by the parties.

*In re Z.C.* at ¶ 11.

{¶ 27} In reviewing a sufficiency-of-the-evidence challenge, we must examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof. *See id.* at ¶ 12, citing *Cross* at 477. "When reviewing for manifest weight, the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and

determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered." *Id.* at ¶ 14, citing *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 20.

{¶ 28} With respect to Mother's challenges to the weight of the evidence supporting the juvenile court's judgment in this case, the Ohio Supreme Court has emphasized the importance of affording appropriate deference to the finder of fact, stating:

> "In weighing the evidence, the court of appeals must always be mindful of the presumption in favor of the finder of fact." [*Eastley*] at ¶ 21. "The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). "'If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment.'" *Id.* at fn. 3, quoting 5 Ohio Jurisprudence 3d, Appellate Review, Section 603, at 191-192 (1978).

*Id.* at ¶ 14.

## 2. First Prong — R.C. 2151.414(B)

{¶ 29} Regarding the first prong of the permanent-custody analysis, the juvenile court found, pursuant to R.C. 2151.414(B)(1)(a), that the children could not be placed with either parent within a reasonable time or should not be placed with their parents.

{¶ 30} When assessing whether a child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents under R.C. 2151.414(B)(1)(a), a juvenile court must consider the factors outlined in R.C. 2151.414(E). *In re A.V.*, 2014-Ohio-5348, ¶ 58 (8th Dist.). A juvenile court is only required to find that one of these factors is met in order to properly find that a child cannot or should not be placed with a parent. *In re Ca.T.*, 2020-Ohio-579, ¶ 27 (8th Dist.), citing *In re V.C.*, 2015-Ohio-4991, ¶ 42 (8th Dist.).

{¶ 31} In this case, the juvenile court found the children could not be placed with either parent within a reasonable time or should not be placed with either parent pursuant to the factors outlined in R.C. 2151.414(E)(1), (2), (9), (10), (13), (15) and (16). These provisions provide as follows:

(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

(2) Chronic mental illness, chronic emotional illness, intellectual disability, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code;

. . .

(9) The parent has placed the child at substantial risk of harm two or more times due to alcohol or drug abuse and has rejected treatment two or more times or refused to participate in further treatment two or more times after a case plan issued pursuant to section 2151.412 of the Revised Code requiring treatment of the parent was journalized as part of a dispositional order issued with respect to the child or an order was issued by any other court requiring treatment of the parent.

(10) The parent has abandoned the child.[2]

. . .

(13) The parent is repeatedly incarcerated, and the repeated incarceration prevents the parent from providing care for the child.[3]

. . .

(15) The parent has committed abuse as described in section 2151.031 of the Revised Code against the child or caused or allowed the child to suffer neglect as described in section 2151.03 of the Revised Code, and the court determines that the seriousness, nature, or likelihood of recurrence of the abuse or neglect makes the child's placement with the child's parent a threat to the child's safety.

. . .

(16) Any other factor the court considers relevant.

{¶ 32} After careful consideration, we find the record supports the juvenile court's determination that A.K. and S.A. clearly and convincingly could not or should not be placed with either parent within a reasonable time. In this case, the children were removed from Mother's care due to her prior history with CCDCFS and her extensive history of substance-abuse and mental-health issues. As mentioned, Mother was actively using drugs during her pregnancy and was incarcerated at the

---

2 This finding was only included in the judgment entry pertaining to A.K.

3 This finding was only included in the judgment entry pertaining to S.A. The child's biological father, Sh.A. was incarcerated at the time of trial.

time of S.A.'s birth. After the complaint for temporary custody was filed, CCDCFS developed a case plan for reunification that was designed to address the agency's ongoing concerns with Mother's ability to care for the children.

{¶ 33} Upon review, we find the record reflects that Mother failed to complete significant portions of her case plan and, therefore, failed to substantially remedy the conditions that caused the children to be removed from her home. Regarding her substance-abuse issues, Mother was diagnosed with severe opiate and cocaine disorders. In February 2024, Mother successfully completed a court-ordered substance-abuse program through Hitchcock and was progressing in her case plan. From that point on, however, Mother relapsed and failed to consistently comply with the requests of the agency or the recommendations of the referred substance-abuse providers. Campbell testified, for example, that Mother only participated in one session of an outpatient program through Signature Health. Thereafter, Mother enrolled in drug treatment services through OhioGuidestone. Again, however, Mother only attended one virtual session of the outpatient program at OhioGuidestone and logged off of the appointment before it was completed. Campbell testified that Mother had not successfully completed any recommended substance-abuse services by the time of trial. Campbell further stated that Mother had a history of noncompliance with requested drug screens. Mother's last drug screen for the agency was completed in May 2024. Mother did not submit to any of the requested drug screens between February 2025 and the date of trial. (Tr. 21-22.) Thus, Mother's date of sobriety, if any, was not established by a verifiable source.

{¶ 34} The agency also had ongoing concerns with Mother's ability to provide the children with a permanent home based on her failure to adequately address the mental-health issues that have contributed to her drug use and pattern of relapses. Although Mother completed a mental-health assessment, the medical records introduced at trial demonstrate that Mother's participation and attendance at scheduled appointments has been erratic. Specifically, Mother only attended five of the 22 mental-health appointments scheduled through Signature Health. Mother's attendance at mental-health appointments scheduled through OhioGuidestone was equally scarce. Accordingly, Campbell testified that Mother had not complied with the mental-health objectives of her case plan.

{¶ 35} Finally, the record shows that Mother failed to provide the agency with documented evidence of secure, permanent housing. Although Campbell confirmed that she had previously visited Mother's current residence, the agency could not confirm whether Mother was enrolled in a housing program through EDEN. Thus, the agency had no knowledge of the terms of Mother's housing or even if she was legally residing in the home. This factor was significant to the agency because Mother had no verifiable employment.

{¶ 36} Under the foregoing circumstances, we are unable to conclude that the juvenile court's findings under R.C. 2151.414(B)(1)(a) and (E) were against the manifest weight of the evidence. The juvenile court was presented with all relevant information at trial and was in the best position to assess the credibility of Campbell's testimony and weigh the evidence going to each statutory factor. Here,

the evidence adduced at trial demonstrated that the alleged fathers of the children had no involvement or interaction with the children during the pendency of this case. The evidence also highlighted Mother's failure, or unwillingness, to address the agency's concerns with respect to her ability to adequately care for the young children within a reasonable period of time. Significantly, Mother has no established sobriety date and has failed to take the necessary steps to permanently resolve her chemical dependency. In addition, Mother has not meaningfully engaged with her mental-health treatment and continued to engage in troubling conduct during the pendency of this case that led to additional criminal charges, her incarceration in unrelated cases and prolonged absences from the children. Accordingly, we find clear and convincing evidence supported the juvenile court's conclusion that the children could not, or should not, be placed with either parent within a reasonable time pursuant to R.C. 2151.414(B)(1)(a).

### 3. Second Prong: Best Interest of the Child

{¶ 37} Having determined that competent and credible evidence supports the juvenile court's finding that the child could not or should not be returned to either parent within a reasonable time, we now turn to the second prong of our analysis, which requires the court to determine, by clear and convincing evidence, whether it is in the best interest of the child to grant permanent custody to the agency pursuant to R.C. 2151.414(D).

{¶ 38} "In determining the best interest of a child, a juvenile court 'may apply one of two different tests.'" *In re S.C.,* 2022-Ohio-356, ¶ 38 (10th Dist.),

quoting *In re J.P.*, 2019-Ohio-1619, ¶ 39 (10th Dist.). "'Under R.C. 2151.414(D)(1), the juvenile court weighs multiple factors . . . to decide whether granting an agency permanent custody of a child is in that child's best interest.'" *Id.*, quoting *In re J.P.* at ¶ 39. "By contrast, 'under R.C. 2151.414(D)(2), if the juvenile court makes [each of] the four enumerated findings, permanent custody is per se in the child's best interest and the court "shall" commit the child to the permanent custody of the agency.'" *Id.*, quoting *In re J.P.* at ¶ 39. "These two provisions 'are alternative means for reaching the best-interest determination.'" *Id.*, quoting *In re J.P.* at ¶ 40.

{¶ 39} In this case, the juvenile court applied R.C. 2151.414(D)(2) and found, by clear and convincing evidence, "that a grant of permanent custody is in the best interests of the [children]." R.C. 2151.414(D)(2) provides as follows:

> If all of the following apply, permanent custody is in the best interest of the child, and the court shall commit the child to the permanent custody of a public children services agency or private child placing agency:
>
> > (a) The court determines by clear and convincing evidence that one or more of the factors in division (E) of this section exist and the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent.
> >
> > (b) The child has been in an agency's custody for two years or longer, and no longer qualifies for temporary custody pursuant to division (D) of section 2151.415 of the Revised Code.
> >
> > (c) The child does not meet the requirements for a planned permanent living arrangement pursuant to division (A)(5) of section 2151.353 of the Revised Code.

(d) Prior to the dispositional hearing, no relative or other interested person has filed, or has been identified in, a motion for legal custody of the child.

{¶ 40} If all the factors enumerated under R.C. 2151.414(D)(2) are applicable, permanent custody is per se in the child's best interest and the juvenile court must commit the child to the permanent custody of the agency. *In re G.A.*, 2020-Ohio-2949, ¶ 61 (8th Dist.), citing *In re J.R.*, 2018-Ohio-1474, ¶ 41 (10th Dist.).

{¶ 41} Upon review, we find there is competent, credible evidence in the record to support the juvenile court's reliance on the factors set forth under R.C. 2151.414(D)(2) and its conclusion that permanent custody to the agency is in children's best interests. In this case, the children were removed from Mother's care in August 2023 and remained in the agency's custody throughout the pendency of these proceedings. Accordingly, as of the date of the permanent-custody trial, the children had been in the agency's custody for approximately 25 months and no longer qualified for an extension of temporary custody. *See* R.C. 2151.415(D)(4) ("[T]he court shall not order an existing temporary custody order to continue beyond two years after the date on which the complaint was filed or the child was first placed into shelter care, whichever date is earlier, regardless of whether any extensions have been previously ordered pursuant to division (D) of this section."). Moreover, as previously discussed, the juvenile court's findings under R.C. 2151.414(D)(2)(a) and (E) are supported by ample evidence in the record. Mother has failed to successfully remedy the severe substance-abuse and mental-health

issues that have impaired her parenting in the past, and she continues to engage in questionable conduct that has led to additional criminal charges and prevents her from maintaining a safe and adequate home for the children. Finally, the young children did not meet the requirements for a planned permanent-living arrangement (to do so, a child must be at least 16 years old) and the agency was unable to identify any relatives or other interested person who could take legal custody of the children. R.C. 2151.353(A)(5).

{¶ 42} Based on the foregoing, we cannot say that this is the exceptional case where the juvenile court lost its way and created a manifest miscarriage of justice in evaluating the best-interest factors. The juvenile court was presented with all relevant evidence relating to the R.C. 2151.414(D)(2) findings, including the children's custodial history and the significant issues Mother has yet to resolve. Although "[f]amily unity and blood relationship are vital factors to carefully and fully consider," the "paramount consideration" is always the best interest of the child. *In re J.B.*, 2013-Ohio-1704, at ¶ 111. While Mother loves her children and has visited with them regularly when not incarcerated, she has failed to demonstrate the ability to provide the children with a safe and stable home despite having over two years to do so.

{¶ 43} Viewed collectively, the R.C. 2151.414(D)(2) findings mandated that permanent custody is in the children's best interests and that the court commit the children to the permanent custody of the agency. Accordingly, we find the juvenile court's judgment granting the agency permanent custody and terminating Mother's

parental rights is supported by clear and convincing evidence in the record and is not against the manifest weight of the evidence.

{¶ 44} The sole assignment of error is overruled.

{¶ 45} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the Cuyahoga County Court of Common Pleas, Juvenile Division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.


_____
EILEEN A. GALLAGHER, JUDGE

MARY J. BOYLE, P.J., and
MICHAEL JOHN RYAN, J., CONCUR